## W. W. McCANLESS *v.* H. W. REYNOLDS.

Where one contracts to sell a well known tract of land described by metes and bounds for a specified sum, and in the deed therefor sub-sequently executed, adds a strip (the *locus in quo*) to. the land sold, without further consideration, it is fraudulent to the grantor's cred-itors, and no title to such added strip passes to the grantee.

Any one who has acquired the rights of a deceased person, whether by his deed or the deed of the sheriff, who is authorized to make a deed for him, is an assignee within the meaning of section 343 of the Code of Civil Procedure, and no distinction· is made between a voluntary and an involuntary assignee.

Neither of the parties, (plaintiff or defendant,) whether claiming as. original parties or as assignees, either by deed of the party or deed of the sheriff, is a competent witness in regard to *conversations* and *transactions* between the party who offers himself as a witness and the assignees of the dead man.

(*Murphy* v. *Ray*, 73 N, C. Rep. 588, cited, commented on and approved.)

CIVIL ACTION, in the nature of *Ejectment*, tried before *Cloud, J.*, at Spring. Term, 1875, of the Superior Court of FORSYTHE County.

The following is, substantially, the statement of the case sent up as a part of the record, upon appeal to this court:

The plaintiff claimed the *locus in quo* as a purchaser at an execution sale, the execution having been issued in his own behalf.

The defendant claimed the same under a deed from one Richard Cox, the defendant in said execution, dated prior to the sheriff's deed to the plaintiff.

The plaintiff alleged, that the *locus in quo* was conveyed to the defendant by the said Cox in fraud of his creditors. In support of this allegation, evidence was adduced tending to show that the plaintiff held a bond for the sum of $1,395.75, against the said Cox, dated the 31st day of March, 1866, and that on the 2d day of April, 1866, he commenced an action

on said bond. That at Fall Term, 1866, the defendant pleaded to the said action, and issues joined therein. The action was pending until Spring Term, 1867, when the plaintiff recovered judgment against the defendant; and that execution issued upon the judgment, and the plaintiff became the purchaser of the *locus in quo*, at the execution sale.

Two other actions were commenced against Cox, each on the 22d day of March, 1866, one by W. A. King, and the other by Presley George, together amounting to about $800. That in October following, other creditors instituted actions against Cox, to recover about the sum of $1,060, to.wit, M. L. Smith and J. L. Peatress, the former of whom was a brother-in-law of Cox and the defendant. In the four last mentioned suits, judgments were confessed at Fall Term, 1866.

It was farther in evidence for the plaintiff, that on the 23d day of April, 1866, Cox executed a deed in trust conveying the "Nancy Cox tract of land to secure Charles E. Moore, M. L. Smith and Powell Simmons, his sureties, for a debt of $1,203, due the Bank of Salem, contracted in 1861. That a short time before Cox made the deed to the defendant, he declared that he owed the plaintiff a large debt, and that he did not intend to pay it. That he intended to give Mary Reynolds, a daughter of the defendant, five hundred dollars in the "Molly Cox" land (the *locus in quo*), and the defendant was to have the balance. That a few days before he executed the bond to defendant to make title to the land, which was dated April 11th, 1866, Cox declared that he was about to be sold out, and that "while they were selling, he was going to sell too." A few days after this, Cox went to Virginia to the home of the defendant, when and where the contract between Cox and the defendant was made, and the title bond given. That on the day before the execution of the deed, Cox stated to a neighbor that he was about to sell his "Molly Cox" land to the defendant for $1,500, that he asked $2,000 for it, but the defendant talked like not giving it. That he would not take

that from any body else in the world. That in the fall of 1866, after the conveyance of the land to the defendant, the defendant was at said neighbor's house, and a colored girl told him that she had heard that the defendant's son Dick was to come to live with Richard Cox at his home place, and his daughter Mary was to come to the "Molly Cox" place. That in reply to this, the defendant said that he had never heard of such a thing; that he had thought of giving the "Molly Cox" place to his son Abram.

There was also evidence, tending to show that on the 15th of April, the defendant and Cox came to the house of one Powell Simmons, in Stokes county, and on their arrival the defendant remarked to Gideon E. Moore, who was present at that time, that he was glad to find him there, as he wrote a good hand; that he had bought of Cox his "Molly Cox" tract of land at $1,500, and he wanted a settlement made and a deed drawn. Moore and Simmons remarked that he paid enough for it. Moore excused himself from doing the writing, saying that Simmons was the best draughtsman.

Moore testified that the defendant produced his papers, sitting near to him, and he knew that he had in his hands a bond on Cox to Moody, and by him transferred to the defendant; another for $900, or thereabout; and beside these, there was a small account, upon all of which Simmons computed the interest, Cox admitting each one to be justly due Simmons, announced the result of the calculation as $1,450, or about that sum. The defendant thereupon remarked to Cox, that it was very near what they had made it, the only difference being that Simmons had counted the fractions. It was further in evidence, that the deed was not drawn on that occasion, owing to the fact that Cox did not know the courses of the lines to the "Molly Cox" tract, and Cox left Simmons to go to his house, a few miles off, to get his deed, and was to come back that evening, but did not. The defendant stayed all night at

Simmons,' and the next morning he and Simmons went off together, saying they were going to Cox's to draw the deed.

It was further in evidence, that on arriving at Cox's house, they found him with a trunk open, looking for an old deed, which he did not find; and the question arose as to how the "Molly Cox" land should be described so as to distinguish it from other lands belonging to Cox, adjacent thereto. Cox wanted the line to run across the creek, near the ford, and the defendant insisted that it should run below the ford. This disagreement arising, Cox, the defendant, and the witnesses went from the house to the ford, still disagreeing. They then went down to the creek, about a hundred yards to a bend, where there was a large rock in the creek, and a cleared ridge makes a near approach to the creek. The defendant then said to Cox, "I want to see you," and they went off into the woods, out of sight of the witnesses, and were gone sometime. When they returned, the defendant remarked that Cox had agreed for the line to commence at the bend, and run due north and south through Cox's land to his outside lines. The deed was thus drawn, a copy of which the plaintiff offered in evidence. The quantity of land, between the road, as it runs through the land, and the line crossing at the bend, was variously estimated by the witnesses, ranging from twenty-seven to one hundred acres.

It was further in evidence that Cox had been a man of large property up to the time the slaves were emancipated, and afterward owned the following property, to-wit: The "Molly Cox" place, containing four hundred and seventy-five acres, the *locus in quo* sold to the defendant for the sum of $1,500; the "Nancy Cox" place, containing three hundred and twenty-seven acres, said to be worth more than the "Molly Cox" place by some of the witnesses, and by some less, which after the execution of the deed to the defendant, was conveyed in trust and sold at auction for five hundred dollars; the "House place," containing six hundred and thirty-five acres,

worth $3,000, and sold at a sheriff's sale for $1.00 per acre; the "Turkey Branch place," worth from $150 to $400; the "Mountain place," worth $100, and a lot in Danbury, worth $50, besides personal property which brought $275. There was no evidence that Cox was reputed as insolvent at the time of the execution of the deed to the defendant; but some of the witnesses, testified that it was thought that he would break. It was in evidence that before the end of the year 1866, Cox was entirely sold out, leaving a considerable part of his debts unpaid, his property selling for a low price, owing to the scarcity of money, the then prevalent fear of confiscation in that section, and the consequent scarcity of purchasers of real estate.

The evidence as to the value of the "Molly Cox place" was conflicting, some of the witnesses testifying that it was worth more than $1.500, and others that it was worth less. It was further in evidence that the lands retained by Cox after the execution of the deed to the defendant, if sold at the same proportional price, would have paid off all his debts and left a considerable surplus. That before the execution of the deed to the defendant, the defendant asked one Wm. S. Lawson, "if any one had made a break on Cox," stating that he was expecting it, and that on the day after the execution of the deed, defendant came to Lawson's house and told him that he had bought the "Molly Cox place" for $1,500, and asked the witness what he thought of it, and if he had not paid too much. To which the witness replied that it was worth more money. The defendant remarked, "If it was so, it was all in the family; that Cox was old, and would have to be taken care of; that McCanless and others had debts (naming the debt due the Bank of Salem), and if those debts came against him it would break him up. He said McCanless had sued Cox, and asked the witness if he knew anything about the justice of the debt; to which the witness replied, that he knew some portions of it to be just.

It was further in evidence that Lawson was at the sale of the "Nancy Cox place." That some six or eight persons were present, of whom three or four were bidders. One M. L. Smith, a brother-in-law of Cox, became the purchaser, at the price of $510. That, in the opinion of the witness, the land was worth five dollars per acre. (The tract contained three hundred and twenty-seven acres.) That the defendant had told the witness to attend the sale of Cox's personal property and buy some articles for Cox, which he did. Afterward the defendant complained that he bought more than he was instructed to buv, and proposed that the witness should take and pay for a part, and he would pay for the balance for Cox. At this proposition some unpleasantness and irritation was shown, and the witness refused to do so, saying if he took a part he would take all. There was no hard feeling between them that witness knew of. After this disagreement the witness went after the articles purchased, when Cox alleged that the defendant had promised to give him a home on the "Molly Cox place" for life, and to buy these articles for him. The next time the witness saw the defendant he communicated to him these declarations of Cox. This was in the Spring of 1867. The defendant replied that M. L. Smith had as much right to take care of Cox as he had, that he had a large family of his own to attend to.

On cross-examination the defendant asked the witness if he was not a bidder at the sale of the "Nancy Cox place;" and if he was not bidding for McCanless with authority from him to run it to five hundred dollars? The witness replied that he was a bidder, but that he had no authority from McCanless and was not bidding for him, but that McCanless had agreed to lend him $500 to help pay for the land. He was also asked if he did not on the day of sale, tell M. L. Smith that McCanless had authorized him to bid for the land and limited him to $500? To which the witness replied, that he had not.

During the progress of the case M. L. Smith was called as a witness for the defense and asked, " what, if anything, W. S. Lawson had said on the day of sale as to his bidding for McCanless. To this question the plaintiff objected on the ground that it was collateral. The court overruled the objection and the plaintiff excepted. The witness thereupon stated that Lawson told him at the sale that he was a bidder for McCanless, and that he had limited him to five hundred dollars.

There was evidence tending to show that the line contended for by Cox had been the reputed line of the " Molly Cox place," on the east, for thirty or forty years; that the tenants on that tract, and on the tract east of it, had before and since Cox become the owner of both, worked to the road on each side and claimed that as the line. That the defendant himself had at a former trial declared on oath, that the road was the reputed line, and that he had only purchased to the road and that he had paid no consideration for the land below the road and only went there to get a permanent object to start from.

The defendant contradicted the evidence as to his testimony on the former trial.

It was farther in evidence on the part of the plaintiff, that he recovered judgment in his suit at Spring Term, 1867, and that execution issued thereupon, under which the *locus in quo* was levied upon and sold, the plaintiff becoming the purchaser at sheriff's sale and taking the sheriff's deed therefor, under which he claims title. The plaintiff also read in evidence the deed from Cox to the defendant conveying the *locus in quo*, dated April 16th, 1866.

The defendant was introduced as a witness in his own behalf, and produced a title from Cox to himself. He also testified to the effect that Cox was dead ; Hopkins an attesting witness was also dead, and that the other attesting witness, a son of the defendant, resided in the State of Tennessee, that

he had endeavored to have him present; that he had promised to be present, and was absent without his consent or procurement.  Evidence having been introduced tending to prove the hand-writing of Cox and also of the subscribing witnesses to the title bond, which the defendant also offered as evidence. To this evidence the plaintiff objected, the objection was overruled, and the plaintiff excepted.

The defendant then offered to show by his own testimony, all the transactions that took place between himself and Cox concerning the *locus in quo*.  To this evidence the plaintiff objected on the ground that Cox was dead.  The objection was overruled by the Court and the plaintiff excepted.

The witness then stated that Cox came to his house, in Virginia, to buy corn.  He declined to sell him any unless he was paid for the same.  He told Cox that he already owed him about $1,500, and that he could not afford to make the debt any larger, and that he would sell him some corn if he could pay him for it, and pay or secure the old debt.  Cox told him he had no money but only land.  The witness then told him he would buy land.  After some chaffering about the trade he bought the "Molly Cox place," and took the title bond.  Cox asked $2,000 for the land, and he offered $1,500 for it in the old debt, and at this price they agreed.  Cox was his brother-in-law, and though a man of means, was very improvident, and for a long time got provisions from the plantation of the witness in Stokes county, and in this way became indebted to him.  About 1857, he had a settlement with Cox and took his bond for $830, the sum due him for provisions previously furnished.  Besides this he paid off a bond due by Cox, to one Nut Moody, for about two hundred dollars.  He also held a small account against Cox, and these three claims with the interest, amounted to $1,450, lacking a few cents.  This with five dollars in cash and nine barrels of corn at $45, was the consideration for the land.  That the $1,500 in old debts was recited in the title bond from a conjecture as to what the debts

would foot up, the interest not having been calculated until a few days afterwards. The title bond was given from an expectation that the plaintiff would not go to Stokes for some time. That finding it convenient sooner than he expected, he went over with Cox and concluded that he would have the matter closed and the deed executed. He came to North Carolina to have the deed executed, because he thought the law required it. He expected that Cox owed McCanless but did not certainly know it when the contract was made, and he did not then know of McCanless having sued Cox, but on the way over to North Carolina Cox told him that he had been sued. He knew of no purpose on the part of Cox to defeat the plaintiff, and heard from him no declaration of any such purpose. On his part, he purchased the land with no purpose, other than to obtain payment of his debt. He suspected no purpose to defraud any one. He then thought Cox able to pay all his debts, and in fact he was able to pay them all if he could have sold all his other property then under no lien, as well in proportion as he had sold the "Molly Cox place" to the witness, which he said he was going to do. The witness further testified as to the execution of the deed and the disagreement as to where the line on the east side of the tract should run. His evidence did not materially differ as to these facts, from the evidence for the plaintiff, except that he stated that he might have gone off with Cox, when they reached the bend of the creek; that he did not recollect doing so, but that if he did, it was for the purpose of hunting for the line, which some one had informed witness ran across the creek about that point. That Cox agreed for the deed to be drawn crossing at the bend instead of foard, while they were on the ground, and he did this from no promise or inducement on the part of the witness to cover the same from his creditors, or for his care or benefit in any wise; and there was no promise of compensation or reward in any way whatever, but it was insisted upon because the witness had heard that the line was at or near the

ridge next below the foard.   There was a remark made at the-
time of the execution of the title bond, by Cox, to Mary
Reynolds that he had always intended to give her the " Molly
Cox place," but he was in debt and he was forced to sell it,
and now her papa could let her have it.   But no such term or
stipulation was made in the contract, and nothing of that kind
was spoken of in the course of the trade, or had any connec-
tion therewith.   He allowed Cox to go into a house on the.
" Molly Cox place " during the winter of 1866-'67.   After he
was entirely sold out, he removed him thence to his house in
Virginia, where he kept him over a year and sought to keep
him longer.   He told W. S. Lawson to attend the sale of the
personal property of Cox, and to buy something for Cox, but
neither of these things were done as an inducement or part
consideration for the land, and from no motive except charity
and regard for him, as the brother of his wife.   There was,
never any understanding that Cox had given to Mary Reynolds
$500 in the price of the land and fixed on $1,500 as the price.
on that account.   No such thing was ever spoken of, or known.
to the witness.

· There was evidence corroboratory of the testimony of the
defendant as to the bond for $930, which the defendant
claimed as a part of the consideration paid to Cox for the.
land ; also as to Cox obtaining provisions from the defendant's.
farm in Stokes county.

The defendent also introduced one Gideon George, a sur-
veyor, who testified that the line, if run at the bend due north
and south, would include exactly the quantity of land specified,
in the bond for title, but if the road be the line, then the:
quantity will be about one hundred acres less.

The defendant also offered in evidence, a deed from Joshua
Cox to Jesse Cox, dated in 1819, and another from Salathiel
Stone, sheriff, to Richard Cox, the grantor of the defendant,
describing the eastern line of the "Molly Cox" tract of land as
to be run on the highest part of the first cleared ridge below

the road, commencing near the middle of the cleared ground. There was other evidence tending to show that the line as established between the defendant and Cox on the day of the execution of the deed was at or near this line. There was no evidence that such line was ever marked, until the sale to Reynolds, the defendant.

It was admitted that Richard Cox had been the owner of the "Molly Cox" tract and the lands adjoining on the east, since 1835 ; and that owning on both sides of the Quaker Gap road, his tenants on both tracts had since that time worked to the road. It was in evidence that Richard Cox and Jesse Cox, under whom he claimed had been heard to speak of the road as the line.

The bond for title describes the land as being a tract in Stokes county, " on both sides of the waters of South Double creek, containing 475 acres more or less, known as the "Molly Cox" tract of land.

Among other things, the court charged the jury : That Cox, owning the land on both sides of the road, had a right to make the dividing line wherever it was agreed upon in his sale to the defendant; and if from the evidence, they could collect that the contract was for lands west of the road, with the road as the line, at the price of $1,500, and that the defendant and Cox afterwards added in a strip between the road and the line crossing at the bend of the creek, and this was without further consideration, it would be fraud, and the plaintiff would be entitled to their verdict. But, if from the evidence, they should find that the contract of sale was of the " Molly Cox" tract of land, by its true lines, at fifteen hundred dollars, and and not by the road, as the line, and that the defendant got no more than he bought ; and should they further find that the defendant paid therefor in old debts and corn and money, fifteen hundred dollars, and that that was a fair price ; then they should find for the defendant ; and if the jury should find that the sale was by the true lines, that then in locating

and determining where that was, and whether at or near the bend of the creek, and thence due north and south, they were at liberty to consider the title bond and all the deeds offered in evidence in the cause, and that as to that matter, the written evidence was of more weight than the oral.

The jury rendered a verdict in favor of the defendant, and thereupon the plaintiff moved for a new trial upon the following grounds:

1. Error in the ruling of the court in the admission of the title bond in evidence.

2. Overruling the objection, and admitting the testimony of M. L. Smith in contradiction of W. S. Lawson.

3. The admission of the testimony of the defendant as to the transaction between Cox, deceased, and himself.

There was no exception to the charge of his Honor, and no instruction prayed for was refused. But it was urged upon the hearing of the motion that the charge, as given, was calculated to mislead the jury.

The motion was overruled, and the plaintiff appealed.

*Clement, T. J. Wilson* and *Joyce*, for appellant.
*Dillard & Gilmer, Watson* and *Glen*, contra.

Pearson, C. J.  There is no error in the charge. It was not calculated to mislead, but, on the contrary, directed the minds of the jury to the very point on which the case turned, to-wit: Did the deed of Cox convey to the defendant more land than was embraced by the original contract of purchase at the price of $1,500, with an intent thereby to benefit said Cox, at the expense of his other creditors? This was fairly left to the jury, and the verdict is in favor of the defendant.

We think there is error in permitting the defendant to testify as to conversations and transactions with Cox, who was dead at the time of the trial.

McCANLESS v. REYNOLDS.

1. Is the plaintiff, who is a purchaser at sheriff's sale, "an assignee" of Cox, within the meaning of sec. 343, C. C. P? Any one who has acquired the rights of the dead man, whether by his deed or by the deed of the sheriff, who is authorized to make a deed for him, is an assignee within the meaning of sec. 343. This is the general meaning of the word, and on the face of the statute no distinction is made between a voluntary and an involuntary assignee.

2. The position is taken: The object of the proviso is to protect dead men, and not to allow conversations and transactions with them to be proved by a party to the action, inasmuch as he is not here to explain the transaction or to justify his conduct in the transaction.

In this case the conduct of the dead man had been called in question by the plaintiff, and he is charged with fraud. So this opens the door, and lets in the defendant, although a party to the action, to explain the transaction, and explain and justify the conduct of the dead man in regard to the transaction. This is a new point upon the construction of sec. 343, and has much plausibility.

After consideration, we are of opinion his Honor erred in allowing the defendant to testify as to conversations and the transactions between himself and Cox. True, this testimony tended to exculpate Cox from the charge of fraud imputed to him by the plaintiff. The plaintiff does not become a witness in his own behalf, but relies on the testimony of third persons. The plaintiff does not assume to represent Cox, except as assignee of his right to the land, treating the deed to defendant as fraudulent; but takes the ground, suppose Cox was living, I could then put him upon *his oath*, whereas now, you let the defendant swear as to the transaction without fear of contradiction, *because the man is dead*.

We are satisfied by the true construction of sec. 343, neither of the parties, whether claiming as original parties or as assignees either by deed of the party or deed of the sheriff, is a

competent witness, in regard to conversations and transactions between the party who offers himself as a witness and the assignee of the dead man.

Allowing a party to an action to give evidence in his own behalf is a wide departure from the rules of evidence at common law, and the proviso in sec. 343, which fixes a limit to this departure should be construed liberally. The effect of it is to exclude one of the parties to a transaction, who is afterwards a party to an action, concerning the right or property involved in the transaction from the enabling clause of the statute, in the event of the death of the other party to the transaction. The proviso rests on the ground, not merely that the dead man cannot have a fair showing, but upon the broader and more practical ground, that the other party to the action has no chance, even by the oath of a relevant witness to reply to the oath of the party to the action, if he be allowed to testify.

The principle is, unless both parties to a transaction can be heard on oath, a party to an action is not a competent witness in regard to the transaction.

There is error. *Murphy* v. *Ray,* 73 N. C. Rep. 588, is not well reported. The original papers show that the depositions of Buchanan and of his wife, *who were the real parties in interest* were read in evidence. This explains the opinion, and brings the case within the exception to the proviso of a very complicated statute, and distinguishes it from our case.

Per Curiam.                          *Venire de novo.*